In re Last Will and Testament of Daniel O'Connor,
Deceased.

**WILLS: Undue Influence—Evidence—Sufficiency.** Evidence reviewed
1 and quite grave doubt expressed as to its sufficiency to sustain a verdict that the will in question was invalid by reason of undue influence. No conclusion declared, owing to reversal on other points.

**WILLS: Undue Influence—Evidence to Rebut—Subsequent Exami-**
2 **nation of Will—Right to Instructions.** The fact that a testator (admittedly of sound mind) saw his purported will at various times subsequent to its execution and, at such subsequent times, was wholly free from any undue influence, and at such times read the will, or had the same read to him, and then expressed no dissatisfaction with it, affords strong and persuasive evidence that the *execution* of the will was not dictated by undue influence, *and proponents are entitled, on request, to an instruction to that effect.*

**TRIAL: Conduct of Counsel—Misconduct—Unjust and Prejudicial**
3 **Imputations—New Trial.** Persistently challenging opposing counsel to waive his legal rights, with equally persistent imputation of improper motive on the part of counsel because he will not

do so, along with charges that the opposing litigant has, in con-
duct apparently proper, been actuated by base and sinister pur-
poses, of which there is no evidence, may demand a new trial.
So *held* where the offending counsel (a) demanded that his oppo-
nent waive his right to object to the reception in evidence of trans-
actions with a deceased and (b) accused the adverse party of
marrying a certain person in order to destroy her competency as a
witness.

*Appeal from Cerro Gordo District Court.*—M. F. EDWARDS,
Judge.

SATURDAY, DECEMBER 18, 1915.

ACTION to contest the will of Daniel O'Connor. The con-
testants are his six daughters. The proponents of the will
are the widow and three sons. The verdict was against the
validity of the will. The proponents have appealed.—*Reversed
and Remanded.*

*Blythe, Markley, Rule & Smith,* for appellants.

*Glass, McConlogue & Glass* (now Glass & Glass), *D. W.
Telford,* and *F. A. Ontjes,* for appellees.

EVANS, J.—The will in question was executed on April
29, 1911. The testator died in December, 1912, at about
eighty years of age. The only ground of contest was that
the will was executed under undue influence, exercised by the
sons of the testator. The mental competency of the testator
is not challenged in the proceedings. At the time of the
making of the will, the property of the testator consisted
mainly of 320 acres of land in Cerro Gordo County and a
residence property in the town of Cartersville. The farm
land was encumbered by mortgages to the amount of $7,000.
By the provisions of the will, the land was devised to the
three sons, charged, however, with the payment of the en-
cumbrances and the further payment of legacies of $1,000-each
to the six daughters. Under the will, the residence property,
of the value of about $1,500, was also devised to the six
daughters. The daughters were also beneficiaries under an

insurance policy, whereby they received $100 each. The foregoing provisions for the children of the testator were all subject to a life estate of the mother, in lieu of a distributive share.

The early history of the family was one of poverty and consequent hardship. The four oldest children were daughters, the next three were sons, and the youngest two were daughters. Except the oldest daughter, the family moved to Cerro Gordo County from Wisconsin about thirty-five years preceding the making of the will. The oldest daughter was at that time married in Wisconsin, and never came to Iowa. Three of the other daughters left home at about the time of their majority, and two of them remained at home until they were about twenty-three and twenty-five years of age respectively. The youngest daughter, Julia, left home at the age of about twenty-three, in the year 1898, and was married in the year 1900. The two youngest daughters, Hannah and Julia, appear to have been provided with greater school advantages than the other children. The three sons had remained at home practically up to the time of the making of the will, and all were, at that time, over forty years of age. Tom, the oldest, was unmarried, and Dan and Mike were each married at about forty years of age. All, however, continued to work jointly with their father, partly upon their own lands and partly upon his, and all the products of the farming went into the same cribs and were fed to the same stock. Tom and Dan had become the owners jointly of 440 acres of land and were such owners at the time of the making of the will, subject to considerable encumbrances thereon. Eight years before the making of the will, an undelivered deed had been executed to Mike, covering 160 acres of land, known as the Home Farm. The title to this land was in the wife of the testator, the deed being duly executed by her and the testator. Such deed was placed on record prior to the death of the testator. Of the land devised to the sons, 80 acres thereof were acquired in 1895, after all the daughters had left home except the youngest,

and 160 acres were acquired in 1900 after the youngest daughter had left home. These lands were bought mainly on time, and whatever payments were made therefor were made out of the joint earnings of the sons and the father.

The charge of undue influence is predicated upon the claim that the sons falsely stated to the father that the daughters, or some of them, had signed a petition for the appointment of a guardian for him. Some time prior to 1910, two of the daughters, Mary Gardner and Ella Kennedy, with their husbands, came to Cartersville to reside. They resided there two or three years. It is practically undisputed that there was some friction between the father and the daughters during that period, and between the father and one of the sons-in-law. O'Connor was a drinking man, and had been such all his life. The habit extended to all of his children. The two daughters, however, attempted to curtail their father, to some extent, in this habit. The druggist was notified of their wishes. The father, however, maintained his liberty of action, and the attempt was abandoned. It is practically undisputed, also, that the father was informed from some source that his daughters had signed a petition asking the appointment of a guardian for him. This was the subject of conversation between him and his daughters on at least one or two occasions, when the daughters assured him of the falsity of such report. The personal relations of the members of this family had always been kind and affectionate. The father had always been affectionate towards all his daughters. The friction already referred to resulted in no harsh language, unless it be deemed that the provisions of the will are such. The two daughters moved away from Cartersville in August, 1910. The other daughters were all non-resident, and had been, for many years.

It is practically undisputed that O'Connor was a man of dominant personality. In his relations with his sons, he did the buying and selling, and they did the work. Though he lived in town, he appeared upon the farm almost daily;

and was active up to within ten days of his death. Though a drinking man, it appears from the testimony on both sides, that he was not in the habit of becoming intoxicated. Indeed, it was testified that he had never been intoxicated, and no contrary evidence was given. Both sides appear to agree upon a somewhat liberal definition of "intoxication". Under this definition, the patient is allowed the full width of the road to vindicate his claim to sobriety. The only sign of excess that any witness ever observed in O'Connor was that, on a few occasions, he had goodnaturedly boxed off the hats of his friends.

The immediate circumstances of the making of the will were as follows: O'Connor went to the banker at Cartersville and asked him to prepare his will. This was the witness Fleming. Fleming advised him to have the same done by an attorney. He thereupon asked Fleming to take down upon the typewriter the certain memoranda which he should give him as to the provisions which he wished incorporated in his will. The reason given for this request was that he would thus avoid the risk of overlooking something. Upon his dictation, Fleming took down such memoranda, which were as follows:

"Michael O'Connor to have the SE ¼ of section 4-94-19, which property has been deeded to him, but deed not delivered. Michael O'Connor also to have the NE of the NE of 9-94-19, but out of this to pay $500.00 to Kate McMahon and $500 to Julia Daubenberger. Daniel O'Connor, Jr., to have the NW of the NE of 9-94-19, and out of it is to pay $500.00 to Mary Gardner and $500 to Ellen Kennedy. Thos. O'Connor to have the E ½ of the NE of 8-94-19, and out of it is to pay $500.00 to Nora Fritz and $500 to Hannah Fitzgerald. There is an incumbrance of $3,000.00 against the N ½ of the NE of 9, and the E ½ of the NE of 8, all in Twp. 94, Range 19, which amount is to be paid as follows: Thos. O'Connor, $1,500.00 and Michael O'Connor and Daniel O'Connor, Jr., each $750.00. The NW ¼ of section 4-94-19 is to go to

Daniel O'Connor, Jr., Thos. O'Connor and Michael O'Connor. There is an encumbrance of $4,000.00 on this land, which is first to be paid, and after this I direct that the sum of $500.00 be paid to each of my six daughters, as follows: Mary Gardner, Ellen Kennedy, Hannah Fitzgerald, Nora Fritz, Kate McMahon and Julia Daubenberger. After the incumbrance is paid and this amount paid to each of my six daughters, this land is to be shared equally between Daniel O'Connor, Jr., Thos. O'Connor and Michael O'Connor. Property in Cartersville (dwelling) to be shared equally between my six daughters named above, after provision is made for my wife during her lifetime. All my personal property, including horses, cattle, machinery, hogs and other personal effects located on my different farms to go to Michael O'Connor. My $500.00 stock in the Farmers' Savings Bank of Cartersville, Iowa, to go to Daniel O'Connor, Jr., and Thos. O'Connor.''

On April 22, 1911, he took the memoranda with him to the office of the witness Cliggitt, an attorney at Mason City. He employed Cliggitt to prepare the will and to send the same to him at a later day. The will was prepared and sent by mail. Upon receiving the copy, O'Connor discovered that it omitted all reference to the dwelling property at Cartersville, which was to be devised to the daughters. He therefore returned it for correction. Later, he received a corrected draft. This was executed in due form by O'Connor at the bank at Cartersville. It was kept by O'Connor with his private papers in a lock box in this bank. It appears from the testimony of Fleming that, on two or three occasions thereafter, he examined the will at the bank, and some other papers. The principal occasion for this was that some errors had been made in the spelling of names, the possible effect of which gave him some concern. The last of these occasions when he examined the will was about ten days before his death. He expressed some concern that there should be no mistake or irregularity in it.

The most serious questions presented for our consideration on this appeal are:

(1)   Does the verdict adverse to the will have sufficient support in the evidence?

(2)   Was the alleged misconduct of counsel for the contestants in the course of the trial such as to have worked substantial prejudice to the proponents?

(3)   Should the trial court have given to the jury Instruction No. 11, requested by the proponents, or its equivalent?

I.   The question of the sufficiency of the evidence is one to which we have given much consideration. Assuming that there is sufficient evidence to go to the jury that the sons falsely represented to the testator that his daughters had signed a petition for the appointment of a guardian for him, the question still remains whether he really relied upon such statements or was deceived thereby, and, still more important, whether he was unduly influenced thereby in the making of his will. Contestants introduced in evidence the following letter, written by the testator to his daughter Julia, then residing in Idaho, on September 24th next preceding the date of making the will:

1. WILLS: undue influence: evidence: sufficiency.

"Cartersville, Iowa, Sept. 24.

"Well Julia, I will write you about some trouble I am having with the girls. I am ashamed of the way they are acting. The boys tell me they are appoint a guardeen over me; that I am not capable of taking care of my Bizness, and they have been going to Mason City and getting up a petishum for that purpose and the object is to try to get my property away from me. If that is the case I will see that it is dam little of it they will get. I am ashamed of the way they are doing and I wish they never came back here to live. How is Henry and the children?

"Your Father."

The other evidence introduced by contestants consisted in the main of alleged admissions by the proponents and statements by the testator. Both sides introduced evidence of declarations of the testator, many years prior to the making of the will, as to the future disposition of his estate. For the contestants, Driscoll testified that, eight years prior to the making of the will, the testator had said that he should give the land to the boys and $3,000 *each* to the girls. Driscoll's wife, also a witness for the contestants, testified to the same conversation, to the effect that the testator said he would give $3,000 to the girls. The word "each" represents the difference between the testimony of this husband and wife. It is equivalent to the difference between $3,000 and $18,000. When it is considered that the principal value of the testator's estate was made by the great increase in the value of lands in the last few years of his life, the testimony of Driscoll looks greatly strained, and his recollection of the use of the word "each" at that particular time may have been stimulated somewhat by present conditions. One witness for the contestants testified that, thirteen years prior, the testator had said that the girls were to have "the land across the road". This seems to refer to 80 acres owned by the testator and lying across the road from the home farm. It was worth, at the time of the conversation, not to exceed $40 an acre. Another witness testified that the testator said that the girls were to have the home place. This consisted of 160 acres. The title thereto was held by the wife, and not by the testator. A deed thereof was subsequently executed, in 1903, by husband and wife to the son Mike. There is no claim that any undue influence had ever been exercised in reference to this transaction at the time of the making of the deed. The actual delivery of the deed occurred after the making of the will. Taking the testimony for the contestants, therefore, at this point, it indicates that it had been the avowed purpose of the testator, in the distribution of his estate, to leave practically all the land to the boys. When the will was finally

executed, it was after some degree of consultation with his wife and with his banker and with his attorney. To none of them did he indicate any hostility to any of his children. Substantial provision is made in the will for the widow, the mother of all the parties to the case. There is no claim that she exercised any improper influence over the testator. She is one of the proponents, and is deprived of the provision in her behalf as a result of the adverse verdict.

On the question of whether the daughters had signed a petition for the appointment of a guardian, the alleged false representations were known by the daughters during the lifetime of the testator. The testator had the full benefit of their denial. The testator was in a better position to ascertain the falsity of such representations than court or jury can be. The subject had been dropped long before the decease of the testator. Without substantial dispute, the sum of the situation, in brief, was that the testator was mentally competent; that he was a man of affairs and maintained his dominance as the head of the family until within a few days prior to his death; that, if he ever believed the alleged false representations, he was aware, also, that the daughters denied the truth thereof; that the distribution of the estate was in substantial accord with the expressed purpose of the testator for many years; that the alleged friction between the testator and his daughters existed only as between him and two of the daughters; that there was no discrimination in the will as between the daughters; that the relation of the sons to the acquisition of the real estate, and their joint farming operations with their father for so many years, presented strong equitable considerations which fully explain the apparent discrimination as between sons and daughters; that the second draft of the will included a provision for additional property for the daughters which had been overlooked in the first draft of the will; that the testator lived for nearly two years after the execution of the will and had its custody and ready access

thereto; that he did examine it and re-examine it for possible errors.

We deem the question of the sufficiency of the evidence to sustain the verdict of the jury as a very close one. Inasmuch as a new trial must be ordered on other grounds, as hereinafter stated, we deem it appropriate not to pass upon this question at the present time. The evidence upon another trial may clear the doubts in that regard.

II. We pass to the question whether the trial court should have given the requested instruction No. 11. The instructions actually given by the court evince great care in their preparation. They were quite general and abstract, and were appropriate, as far as they went. They were not concrete at any point. The proponents requested the following instruction:

2. WILLS: undue influence: evidence to rebut: subsequent examination of will: right to instruction.

"If you find from the evidence that Daniel O'Connor, Sr., being of sound mind, at various times after the execution of the will had the same read over to him and expressed no dissatisfaction with the provisions of the will, and that at such times he was not under the coercion of any of the proponents, and that he was not unduly influenced in any way at such times, then such facts are cogent evidence tending to show that the instrument in question was in truth and in fact the true will of Daniel O'Connor, Sr."

This was refused. No instruction was given covering in any manner this phase of the subject. It is urged by appellees that the requested instruction was improper in that, if the will was invalid when made, it could not afterwards be rendered valid by the mere subsequent statements or conduct of the testator. Such is not the effect of the requested instruction. The question is not whether a testator may, by ratification, render valid a will otherwise invalid. It may readily be conceded that he cannot do so. The question at issue at this point was whether the testator, in the execution of his will,

was induced by undue influence to execute a will which he would not otherwise have made. If it should be made to appear that, at a later time, while the will was in his custody and under his observation, and while he was entirely free from the alleged undue influence, he was then satisfied with his will in the form in which it was, it is evidence tending to show that the will had not been dictated by previous undue influence. *Parker v. Lambertz,* 128 Iowa 496; *In re Estate of Townsend,* 128 Iowa 621; *Fothergill v. Fothergill,* 129 Iowa 93, 99. The evidence was appropriately admitted in this case, and presumably for that very purpose. The purpose for which it was admitted, however, was not made known to the jury. The requested instruction was an appropriate explanation of the purpose and tendency of the evidence. The evidence as a whole was such as to render such instruction, or its equivalent, peculiarly appropriate, and we think it ought to have been given.

III. In view of our conclusion in the foregoing division and the necessity of awarding a new trial on the ground therein indicated, no useful purpose will be subserved by setting forth the record pertaining to alleged

3. TRIAL: conduct of counsel: misconduct: unjust and prejudicial imputations: new trial.

conduct of opposing counsel prejudicial to the proponents. To set it forth in full would require the incorporation of several pages of the record. The conduct complained of was quite persistent and quite ignored the rulings of the court. It consisted in part of repeated challenges to the attorney for proponents, in the presence of the jury, that he waive the prohibition of Code Section 4604. Proper objections to evidence of personal transactions with an interested witness were repeatedly met with such challenge. At one time, it was said that "the counsel on the other side (for proponents) will not fail to take advantage of every possible technicality that there is in an effort to beat this case". Again the challenge: "You throw down the bars of the statute and let us have some of these conversations, and we will have no objection to any

conversation or remark that she had with her father or any of the other girls either; but you won't do it." Again, "I am willing to let the bars down and let all the talk that was had with the children, any of them, go in; but you won't do that."

It appears in the evidence that the son Tom was married about three weeks before the trial. His wife had been a domestic in the O'Connor home. Referring to that fact, counsel for the contestants made the following remark to the opposing counsel, in the presence of the jury: "Yes, you wanted to cut her off so we couldn't use her here, and Tom married her." A considerable number of other insinuations of fact were indulged in, which were without any warrant in the evidence, and which were calculated to prejudice the jury.

It is to be said for counsel, in the way of mitigation, that these things were said in the heat of trial, and were probably repented later; but this did not purge the record nor remove the prejudice. Without going into further details, it is perhaps enough to say that no one will recognize the impropriety of this conduct more fully than the distinguished counsel who fell into it. It was calculated to work prejudice to the proponents, and we are constrained to say, upon this record, that it did work such prejudice. When a practitioner has reached distinction at the bar and high standing in the community, the obligations of propriety are even more exacting upon him than they are upon an inexperienced beginner, who stumbles through his case in the only way he knows, because the resulting prejudice in such case is greatly emphasized.

For the reasons indicated in Divisions II and III hereof, a new trial must be awarded, and the judgment below is accordingly reversed.—*Reversed and Remanded.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.